# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| In Re: | )    Case No.: 10-6103-als11 |
| | ) |
| **EAGLES CREST LEASING GROUP 1, LLC** | )    Chapter 11 |
| | ) |
| | )    Honorable Anita L. Shodeen |
|      Debtor and Debtor in Possession. | ) |
| | )    **DEBTOR'S <span style="color:red">FIRST AMENDED</span>** |
| PO Box 5247 | )    **DISCLOSURE STATEMENT DATED <span style="color:red">~~JUNE 24~~AUGUST 12</span>, 2011** |
| Coralville, IA   52241 | ) |
| | ) |
| EIN:  xx-xxx0894 | )    <u>Combined Hearing on Approval of Disclosure</u> |
| | )    <u>Statement and Confirmation of Plan</u> |
| | )    Date:  August 1, 2011 |
| | <span style="color:red">)</span>    Time:  1:30 p.m. |
| | )    Courtroom:  1 |

Jeffrey D. Goetz, Esq., IS #9999366
Donald F. Neiman, Esq., IS #9999933
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com

General Reorganization Counsel

# TABLE OF CONTENTS

ARTICLE I.     INTRODUCTION .................................................................................. 1

   A.   The Purpose of the Disclosure Statement ....................................................... 1

   B.   Definitions........................................................................................................ 5

       1.   Defined Terms ....................................................................................... 5

       2.   Terms Not Defined ................................................................................ 6

ARTICLE II.     CONFIRMATION REQUIREMENTS ............................................... 6

   A.   Who May Vote or Object.................................................................................. 6

       1.   Who May Object to Confirmation of the Plan ...................................... 6

       2.   Who May Vote to Accept/Reject the Plan ............................................ 6

       3.   What is an Allowed Claim/Interest....................................................... 6

       4.   What is an Impaired Claim/Interest ...................................................... 7

       5.   Who is not Entitled to Vote ................................................................... 8

       6.   Who can Vote in More than One Class .................................................. 8

       7.   Votes Necessary to Confirm the Plan ................................................... 8

       8.   Votes Necessary for a Class to Accept the Plan ................................... 9

       9.   Treatment of Non-accepting Classes - Absolute Priority Rule.............. 9

     10.   Request for Confirmation Despite Non-Acceptance by Impaired Classes ........... 11

ARTICLE III.     DESCRIPTION OF THE PLAN ....................................................... 11

   A.   What Creditors and Interest Holders will Receive Under the Proposed Plan............... 11

   B.   Unclassified Claims ....................................................................................... 11

       1.   Administrative Expenses ..................................................................... 11

       2.   Court Approval of Fees Required ........................................................ 12

       3.   Priority Tax Claims .............................................................................. 13

   C.   Classified Claims and Interests ..................................................................... 13

       1.   Classes of Secured Claims................................................................... 13

       2.   Classes of Unsecured Claims and Interests ........................................ 14

   D.   Other Provisions of the Plan .......................................................................... 15

       1.   Effective Date of the Plan ................................................................... 15

       2.   Executory Contracts and Unexpired Leases ....................................... 15

ARTICLE IV.     MEANS FOR EFFECTUATION OF THE PLAN............................ 16

   A.   Reduction of Secured Debt Obligations......................................................... 16

   B.   Change in Property Management.................................................................... 16

   C.   Compliance with Projections. ........................................................................ 18

ARTICLE V.     DESCRIPTION OF THE DEBTOR................................................... 18

   A.   Description of the Debtor's Business............................................................... 18

   B.   Principals of Debtor ....................................................................................... 18

ARTICLE VI.     REASONS FOR FINANCIAL DIFFICULTIES ............................. 19

ARTICLE VII.     PRE-PETITION ASSETS AND VALUATION ............................. 19

ARTICLE VIII.   HISTORICAL AND CURRENT FINANCIAL INFORMATION.................. 19

ARTICLE IX.     LIQUIDATION ANALYSIS............................................................. 19

ARTICLE X.     FEASIBILITY .................................................................................... 20

ARTICLE XI.     FINANCIAL PROJECTIONS........................................................... 21

ARTICLE XII.     ECLG AS CHAPTER 11 DEBTOR AND POST-PETITION EVENTS........ 22

A.  ECLG's Petition ................................................................................................ 22

B.  Administrative and First-Day Orders .......................................................... 22

C.  Official Unsecured Creditors Committee ..................................................... 23

D.  Cash Collateral Stipulation .......................................................................... 23

E.  Claims Bar Dates .......................................................................................... 23

    1.  Claims for Pre-Petition Debts ................................................................ 23

    2.  Administrative Expense Claims .............................................................. 24

F.  General Reorganization Counsel - Bradshaw, Fowler, Proctor & Fairgrave, P.C. ........ 24

ARTICLE XIII.  MANAGEMENT AND THEIR COMPENSATION ..................................... 25

ARTICLE XIV.  UNITED STATES TRUSTEE SYSTEM FUND FEES ................................. 26

ARTICLE XV.   TAX ANALYSIS ............................................................................................. 26

A.  Tax Impact on the Debtor ............................................................................. 27

B.  Tax Impact on Creditors ............................................................................... 27

C.  Tax Impact on Equity Interest Holders ........................................................ 28

ARTICLE XVI.  RISKS TO CREDITORS UNDER THE PLAN AND AVOIDANCE
ACTIONS ................................................................................................ 28

ARTICLE XVII. DEFAULT PROVISIONS ............................................................................. 29

A.  Events of Default .......................................................................................... 29

B.  Cure of Prior Defaults. .................................................................................. 30

C.  Consequences of Default. .............................................................................. 30

D.  Post-Confirmation Conversion/Dismissal .................................................... 32

E.  Revocation of the Order Confirming the Plan .............................................. 32

ARTICLE XVIII.  EFFECT OF CONFIRMATION OF PLAN ................................................ 33

A.  Discharge ....................................................................................................... 33

B.  Binding Effect ............................................................................................... 34

C.  Vesting of Property ....................................................................................... 34

D.  Modification of the Plan ................................................................................ 34

E.  Post-Confirmation Status Report .................................................................. 35

F.  Final Decree .................................................................................................. 35

G.  Retained Bankruptcy Court Jurisdiction ...................................................... 35

H.  Abstention ..................................................................................................... 37

ARTICLE XIX.  CONCLUSION AND RECOMMENDATION .............................................. 37

EXHIBIT A - Schedule Of Allowed Class 3 Administrative Convenience Claims And
Allowed Class 4 General Unsecured Claims .................................................. 39

EXHIBIT B - Liquidation Analysis ......................................................................... 40

EXHIBIT C - Pre-Petition Assets ............................................................................ 41

EXHIBIT D - Summary Pages Of Post Petition Monthly Operating Reports From
January Thru May, 2011 ................................................................................. 42

EXHIBIT E - Projections Of Future Income And Expenses June 2011 Through
December 2013 ................................................................................................ 43

iii

## ARTICLE I.  <u>INTRODUCTION</u>

EAGLES CREST LEASING GROUP 1, LLC ("ECLG," "Debtor" or "Debtor in Possession") is the Debtor in this Chapter 11 Bankruptcy Case.  On December 27, 2010 ("Petition Date"), the Debtor filed its Voluntary Petition for Relief under Chapter 11 of the United States Bankruptcy Code ("Code"), 11 U.S.C. § 101 et seq., in the United States Bankruptcy Court for the Southern District of Iowa ("Bankruptcy Court").

Chapter 11 allows a Debtor, and under some circumstances, Creditors and other Parties in Interest, to propose a ~~Plan~~<u>plan</u> of ~~Reorganization ("Plan").~~<u>reorganization.</u>  A ~~Plan~~<u>plan of reorganization</u> may provide for a Debtor to reorganize its affairs and continue to operate, to liquidate, or a combination of both.  The Debtor (the "Plan Proponent") is the party proposing the ~~Plan~~<u>plan of reorganization</u> sent to you in the same envelope as this ~~Disclosure Statement~~<u>disclosure statement</u> document.

A.      <u>The Purpose of the Disclosure Statement</u>

Pursuant to Bankruptcy Code § 1125, the Debtor has prepared and filed this <u>First Amended</u> Disclosure Statement <u>Dated August 12, 2011 ("Disclosure Statement")</u> along with ~~the~~<u>its First Amended</u> Plan <u>of Reorganization Dated August 12, 2011 ("Plan")</u>, for the Court's approval and submission to the holders of Claims and Interests.  Pursuant to its authority under Bankruptcy Code § 105(d)(2)(B), the Bankruptcy Court has decided to combine the hearing on approval of this Disclosure Statement with the hearing on confirmation of the Plan. One of the tests the Bankruptcy Court will apply to this Disclosure Statement is whether it contains "adequate information."

"Adequate Information" is defined in Bankruptcy Code § 1125(a)(1) to mean information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a

hypothetical reasonable investor typical of the holders of Claims or Interests of the relevant Class

to make an informed judgment about the Plan.  <u>In re Metrocraft Publishing Serv., Inc.</u>, 39 B.R.

567 (Bankr. N.D. Ga. 1984).

This Disclosure Statement cannot tell you everything about your rights.  You should

consider consulting your own lawyer to obtain more specific advice on how this Plan will affect

you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any

inconsistencies between the Plan and Disclosure Statement, the Plan provisions will govern.

<u>THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE</u>

<u>ENCLOSED PLAN OF REORGANIZATION (THE "DISCLOSURE STATEMENT" AND</u>

<u>THE "PLAN," RESPECTIVELY).</u>[1]

The Bankruptcy Court will review this Disclosure Statement before the hearing.  Before

the Plan can be confirmed, the Bankruptcy Court must first determine that this Disclosure

Statement contains adequate information.  It is being sent to you in connection with the Debtor's

solicitation of your vote in favor of the Plan.  This Disclosure Statement summarizes what is in

the Plan, and tells you certain information relating to the Plan and the process the Bankruptcy

Court follows in determining whether or not to confirm the Plan.

<u>READ THIS DISCLOSURE STATEMENT CAREFULLY AND FIND OUT THE</u>

<u>FOLLOWING</u>:

1.      WHO CAN VOTE OR OBJECT;

2.      WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., if your Claim is disputed
and what your Claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT
COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;

---

[1] All capitalized terms in this Disclosure Statement are defined in the Debtor's Plan of Reorganization.  In the event
of a conflict, the terms of the Plan control.

3.    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;

4.    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;

5.    WHAT IS THE EFFECT OF CONFIRMATION; AND

6.    WHETHER THIS PLAN IS FEASIBLE.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED BY THE DEBTOR, UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES.  THE DEBTOR HAS AUTHORIZED NO REPRESENTATIONS CONCERNING IT OR ITS FINANCIAL AFFAIRS, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

YOU MAY NOT RELY UPON THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN TO DECIDE HOW TO VOTE ON THE PLAN.  NOTHING CONTAINED IN THE PLAN OR THE DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY.

EXCEPT AS MAY BE SET FORTH IN THIS DISCLOSURE STATEMENT, THE BANKRUPTCY COURT HAS NOT APPROVED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS ASSETS.  THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS OR INDUCEMENT TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED HEREIN AND APPROVED BY THE BANKRUPTCY COURT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER DATE IS SPECIFIED HEREIN.

NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF

RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT AND PLAN

SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE

HAS BEEN NO CHANGE IN THE FACTS SET FORTH IN THE DISCLOSURE

STATEMENT SINCE THE DATE THE DISCLOSURE STATEMENT WAS PREPARED.

ALTHOUGH THE DEBTOR BELIEVES THAT THE CONTENTS OF THE

DISCLOSURE STATEMENT ARE COMPLETE AND ACCURATE TO THE BEST OF ITS

KNOWLEDGE, INFORMATION, AND BELIEF, THE DEBTOR IS UNABLE TO

WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS

WITHOUT ANY INACCURACY.  ANY STATEMENTS REGARDING PROJECTED

AMOUNTS OF CLAIMS AND DIVIDENDS ARE ESTIMATES OF THE DEBTOR BASED

UPON CURRENTLY AVAILABLE INFORMATION AND ARE NOT A

REPRESENTATION THAT SUCH AMOUNTS WILL ULTIMATELY PROVE CORRECT.

THE DEBTOR BELIEVES THAT THE TREATMENT OF CREDITORS UNDER THE

PLAN WILL RESULT IN A GREATER RECOVERY FOR CREDITORS THAN THAT

WHICH IS LIKELY TO BE ACHIEVED UNDER THE DIRECTION OF A TRUSTEE IN A

CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.  ACCORDINGLY, THE

DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTEREST

OF CREDITORS.  THE DEBTOR RECOMMENDS THAT CREDITORS VOTE TO ACCEPT

THE PLAN.

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN

DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF

THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE BANKRUPTCY

COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL
CREDITORS IN THIS CASE.

THE PLAN IS INTENDED TO RESOLVE, COMPROMISE, AND SETTLE ALL
CLAIMS, DISPUTES, AND CAUSES OF ACTION BETWEEN AND AMONG ALL
PARTICIPANTS AND AS TO ALL MATTERS RELATING TO THESE PROCEEDINGS,
EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN.  THEREFORE, APPROVAL OF THE
PLAN SHALL EFFECT THE DISCHARGE AND RELEASE OF THE DEBTOR AND
SETTLE ALL CLAIMS OF CREDITORS, EXCEPT AS EXPRESSLY PROVIDED IN THE
PLAN.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, CREDITORS' CLAIMS
(IF AND TO THE EXTENT ALLOWED) WILL BE PAID IN ACCORDANCE WITH THE
TERMS OF, AND AT SUCH TIME AS SPECIFIED IN, THE PLAN.

    B.    <u>Definitions</u>

        1.    Defined Terms

For purposes of this Disclosure Statement, all capitalized terms used herein, and not
otherwise defined, shall have the meanings set forth in the Plan.  A term used, but not defined in
the Plan, but defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning
ascribed to it in the Bankruptcy Code or the Bankruptcy Rules, unless the context clearly
requires otherwise.  The rules of construction used in § 102 of the Bankruptcy Code shall apply
to construction of this Disclosure Statement and the Plan.  Headings and captions are used in this
Disclosure Statement for the convenience of reference only, and shall not constitute a part of this
Disclosure Statement for any other purpose.

2.      Terms Not Defined

A term used but not defined herein, but defined in the Bankruptcy Code, has the meaning

given to that term in the Bankruptcy Code, unless the context of this Disclosure Statement

clearly requires otherwise.  References to a Code Section are references to the Bankruptcy Code,

except as otherwise stated.

**ARTICLE II.    <u>CONFIRMATION REQUIREMENTS</u>**

PERSONS OR ENTITIES CONCERNED WITH THE CONFIRMATION OF THE

PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

which they may wish to consider, as well as certain deadlines for filing Claims.  The Plan

Proponent CANNOT and DOES NOT represent that the discussion contained below is a

complete summary of the law on this topic.

A.      <u>Who May Vote or Object</u>

1.      Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below,

not everyone is entitled to vote to accept or reject the Plan.

2.      Who May Vote to Accept/Reject the Plan

A Creditor or Interest holder has a right to vote for or against the Plan if that Creditor or

Interest holder has a Claim which is both (1) allowed or allowed for voting purposes and (2)

classified in an impaired Class.

3.      What is an Allowed Claim/Interest

As noted above, a Creditor or Interest holder must first have an <u>Allowed Claim or Interest</u>

to have the right to vote.  Generally, any Proof of Claim or Interest will be allowed, unless a

party in interest brings a motion objecting to the Claim.  When an objection to a Claim or

Interest is filed, the Creditor or Interest holder holding the Claim or Interest cannot vote unless

the Court, after notice and hearing, either overrules the objection or allows the Claim or Interest

for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE WAS <u>APRIL

20, 2011</u>.  A Creditor may have an Allowed Claim even if a Proof of Claim was not timely filed.

A Claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such Claim is not

scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the

Claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to

the interest.

4.    What is an Impaired Claim/Interest

As noted above, an Allowed Claim or Interest only has the right to vote if it is in a Class

that is <u>impaired</u> under the Plan.  A Class is impaired if the Plan alters the legal, equitable, or

contractual rights of the members of that Class.  For example, a Class comprised of general

Unsecured Claims is impaired if the Plan fails to pay the members of that Class 100% of what

they are owed.

In this case the Debtor believes that Classes 2, 3, 4, and 5 are impaired and that holders of

Claims in each of these Classes are therefore entitled to vote to accept or reject the Plan.  The

Debtor believes that Classes 1 and 6 are unimpaired and the holders of the Claims in Class 1 and

the Interest in Class 6 therefore do not have the right to vote to accept or reject the Plan.  Parties

who dispute the Debtor's characterization of their Claim or Interest as being impaired or

unimpaired may file an objection to the Plan contending that the Debtor has incorrectly

characterized the Class.

5.      Who is not Entitled to Vote

The following four types of Claims are <u>not</u> entitled to vote:

a.      Claims that have been disallowed;

b.      Claims in unimpaired Classes;

c.      Claims entitled to priority pursuant to Code §§ 507(a)(2), (a)(3) and (a)(8); and

d.      Claims in Classes that do not receive or retain any value under the Plan.

Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Code § 507(a)(2), (a)(3) and (a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Code.  Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

6.      Who can Vote in More than One Class

A Creditor whose Claim has been allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one Ballot for the secured part of the Claim and another Ballot for the Unsecured Claim.

7.      Votes Necessary to Confirm the Plan

If impaired Classes exist, the Court cannot confirm the Plan unless;

a.      at least one impaired Class has accepted the Plan without counting

the votes of any insiders within that Class, and

      b.    all impaired Classes have voted to accept the Plan, unless the Plan

is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed later in

Paragraph 9 of this Section.

      8.    Votes Necessary for a Class to Accept the Plan

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2)

in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted,

voted in favor of the Plan.  A Class of Interests is considered to have accepted the Plan when at

least two-thirds (2/3) in amount of the Interest-holders of such Class which actually voted, voted

to accept the Plan.

      9.    Treatment of Non-accepting Classes - Absolute Priority Rule

As noted above, even if <u>all</u> impaired Classes do not accept the proposed Plan, the Court

may nevertheless confirm the Plan, if the non-accepting Classes are treated in a manner required

by the Code.  The process by which non-accepting Classes are forced to be bound by the terms

of a Plan is commonly referred to as "cramdown."  The Code allows the Plan to be "crammed

down" on non-accepting Classes of Claims or Interests if it meets all consensual requirements

except the voting requirements of § 1129(a)(8) and if the Plan does not "discriminate unfairly"

and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan as

referred to in Bankruptcy Code § 1129(b) and applicable case law.

      a.    Secured Claims

There are three ways to satisfy the fair and equitable standard with respect to a dissenting

Class of Secured Claims.  The first way is to provide that Class members retain their security

interests (whether the collateral is kept or is transferred by the Debtor) to the extent of their

allowed Secured Claims *and* to give each Secured Creditor in the Class deferred Cash payments that aggregate to at least the amount of the allowed Secured Claim and which have a present value equal to the value of the collateral.  This method of satisfying the fair and equitable standard may be complicated by the application of Bankruptcy Code § 1111(b)(2).  The meaning of "Allowed Secured Claim" as used in this paragraph will depend whether the Secured Class makes a § 1111(b)(2) election to be treated as fully secured despite the fact that the collateral may be worth less than the amount of the Claim.

The § 1111(b)(2) election converts the Unsecured deficiency Claim into a Claim secured by the collateral of the electing Creditor.  If a Creditor so elects, the Debtor must treat the Creditor's entire Claim as a Secured Claim, and the Plan must provide for the Creditor to receive, on account of its Claim, payments (either present or deferred) of a principal face amount equal to the amount of the Claim and of a present value equal to the value of the collateral.

A second alternative for complying with the fair and equitable standard with respect to a Class of dissenting Secured Creditors is for the Plan to provide for the realization of the "indubitable equivalent" of their Secured Claims.

The third alternative for satisfying the fair and equitable standard is to provide in the Plan for the sale of the collateral free and clear of liens, with the liens to attach to the sale proceeds.

b.     Unsecured Claims

There are two ways of satisfying the fair and equitable standard with respect to a dissenting Class of Unsecured Claims.  The first way is for the Plan to provide for distributions to the dissenting Class in an amount equal to the full amount of their Allowed Claims.  The Allowed Claims need not be paid in full on the Effective Date of the Plan.  If the Plan provides for deferred payments, an appropriate discount factor must be used so that the present value of

deferred payments equals the full amount of the Allowed Unsecured Claims of the dissenting

Class.

The second way to satisfy the fair and equitable test with respect to the dissenting Class

of Unsecured Creditors is for the Plan to provide that all Claims that are junior to the dissenting

Class do not receive or retain any property on account of their Claims or Interests.  Accordingly,

if a dissenting Unsecured Creditor Class is to receive property worth only one-half of its

Allowed Claims, the Plan may still be fair and equitable if all junior Classes are to receive or

retain nothing and if no senior Class is to receive more than 100% of its Allowed Claims.

          10.      Request for Confirmation Despite Non-Acceptance by Impaired Classes

The Debtor will ask the Court to confirm this Plan by cramdown on impaired Classes if

any of these Classes do not vote to accept the Plan.

## ARTICLE III.        <u>DESCRIPTION OF THE PLAN</u>

    A.      <u>What Creditors and Interest Holders will Receive Under the Proposed Plan</u>

As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various

Classes according to their right to priority.  The Plan states whether each Class of Claims or

Interests is impaired or unimpaired.  The Plan provides the treatment each Class will receive.

    B.      <u>Unclassified Claims</u>

Certain types of Claims are not placed into voting Classes; instead they are unclassified.

They are not considered impaired and do not vote on the Plan because they are automatically

entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the proponent

has not placed the following Claims in a Class.

          1.      Administrative Expenses

Administrative expenses are Claims for costs or expenses of administering the Debtor's

Chapter 11 case which are allowed under Code § 507(a)(2).  The Code requires that all

Administrative Claims be paid on the Effective Date of the Plan (as defined in Article III, D.1.),

unless a particular Claimant agrees to different, less favorable treatment.

The following chart lists an estimate of the Debtor's § 507(a)(2) Administrative Claims

and their treatment under the Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | $ 0.00 | Paid in full on the Effective Date of the Plan, or according to the terms of the obligation if later. |
| The Value of Goods Received in the Ordinary Course of Business Within 45 Days Before the Petition Date | $ 0.00 | Paid in full on the Effective Date of the Plan, or according to the terms of the obligation if later. |
| Bradshaw, Fowler, Proctor & Fairgrave, P.C., General Reorganization Counsel | $20,000.00 | Paid in full after approval by Court of final fee application. |
| Clerk's Office Fees | $ 0.00 | Paid in full on the Effective Date. |
| Other Administrative Expenses | $ 0.00 | Paid in full on the Effective Date of the Plan or according to separate written agreement. |
| Office of the U.S. Trustee Fees | $4,875.00 | Paid in full on or before the Effective Date. |
| **TOTAL** | **$24,875.00** | |

2.    Court Approval of Fees Required

The Court must rule on all professional fees listed in this chart before the fees will be

owed.  For all fees except the Clerk's Office fees and U.S. Trustee's fees, the professional in

question must file and serve a properly noticed fee application and the Court must rule on the

application.  Only the amount of fees allowed by the Court will be owed and required to be paid

under this Plan.

As indicated above, the Debtor will need to pay approximately $24,875.00 worth of

Administrative Claims on the Effective Date of the Plan unless the Claimant has agreed to be

paid later or the Court has not yet ruled on the Claim.  As indicated elsewhere in this Disclosure

Statement, the Debtor estimates that it will have sufficient funds on hand in Cash on the

Effective Date of the Plan.  The source of this Cash will be from Cash on hand in the Debtor

and/or Reorganized Debtor's bank accounts from business operations.

        3.      Priority Tax Claims

Priority Tax Claims include certain unsecured income, employment, and other taxes

described by Code § 507(a)(8).  The Code requires that each holder of such a § 507(a)(8) Priority

Tax Claim receive regular installment payments of a total value (as of the Effective Date equal to

the allowed amount of such claim) over a period ending no later than five (5) years after the

Petition Date, and in a manner not less favorable than the most favored Non-Priority Unsecured

Creditor Claim under the Plan.

The Debtor did not schedule any Priority Tax Claims, and at the time of the filing of this

Disclosure Statement, no Proofs of Claim have been filed by any taxing authority.

Furthermore, and as shown in the projections and assumptions to projections attached to

this Disclosure Statement, the Debtor is escrowing monthly property tax amounts and

segregating such withholdings in a separate escrow account and such escrowed funds shall be

sufficient to pay the next installment of property taxes.  The Reorganized Debtor shall continue

such escrowing practices prior and subsequent to confirmation of the Plan.

        C.      Classified Claims and Interests

        1.      Classes of Secured Claims

Secured Claims are Claims secured by liens on property of the estate.  The following

chart lists all Classes containing Debtor's Secured Pre-Petition Claims and their treatment under

the Plan:

| CLASS # | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| Unclassified | Administrative – Secured Priority Tax Claims | N | N | Paid in Cash in full per § 1129(a)(9)(C) |
| 2. | Secured Claim of Bank of the West | N | Y | Payment in full in regular monthly payments pursuant to the terms of a Modified Promissory Note and Loan Documents |

2.      Classes of Unsecured Claims and Interests

Unsecured Claims are Claims that are not secured by liens on property of the estate.  The

following chart lists all Classes containing Debtor's Unsecured Pre-Petition Claims and their

treatment under the Plan:

| CLASS # | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1 | Priority-Non Tax Claims | N | N | Paid in Cash in full on the Effective Date of Plan |
| 3 | Administrative Convenience Class Claims | N | Y | Paid in Cash in full on the Effective Date of Plan |
| 4 | General Unsecured Creditors | N | Y | Paid in Cash in full in 2 payments, 12 months and 18 months after the Effective Date of Plan |
| 5 | Subordinated Unsecured Claims of Insiders | Y | Y | No dividend under the Plan |
| 6 | Equity Interests | Y | N | Equity Interest holders retain their interests in corporate debtor |

Class 5 consists of all Allowed Subordinated Unsecured Claims held by an Insider of the

Debtor against the Debtor.  The Debtor believes there exists less than or equal to one (1) Claim,

that of Dovetail Builders II, against the Debtor.  The Debtor considers Dovetail Builders II an

Insider based on the fact that the John Pratt and Alan Meyers are the managers and members of

Dovetail Builders II, and are also two of the managers/members of the Debtor.   The Debtor has

scheduled Dovetail Builders II as having a contingent claim on its Schedule F, and there has

been no Proof of Claim filed by or on behalf of Dovetail Builders II or any other Insiders in this Bankruptcy Case, and therefore Dovetail Builders II does not have an Allowed Claim against the Bankruptcy Estate.  The Debtor is informed and believes there are no other Persons who can be deemed Insiders that have a Claim or Claims against the Debtor.  The Class 5 Claims are impaired. The holder of a Class 5 Claim shall not receive any payments either under or through the Plan or outside of the Plan.  Subordination of Insider Claims is not required under the Bankruptcy Code; however, the Plan's subordination of such Claims reflects the Debtor's belief that the Claims of other Creditors of the Debtor generally should be paid before the Debtor pays Insiders.

      D.    <u>Other Provisions of the Plan</u>

      1.    Effective Date of the Plan

The Effective Date of the Plan will be the first Business Day that is thirty (30) days after the Confirmation Date.  The Debtor anticipates that the Effective Date of the Plan will be September 15, 2011.

      2.    Executory Contracts and Unexpired Leases

The Debtor intends on assuming its executory contract with Sinclair Elevator Company and its unexpired leases with all of the residential tenants in its apartment buildings.  The Debtor intends on rejecting its executory contract with Dial Property Management and Otis Elevator and all other executory contracts and unexpired leases.  The Order of the Court confirming the Plan shall constitute an Order approving the assumption and/or rejection of such unexpired leases and/or executory contracts.  If you are a party to a lease or contract to be assumed and you object to the assumption of your unexpired lease or executory contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

Each entity that is a party to an executory contract or unexpired lease rejected pursuant to the Plan, or any Secured Creditor who asserts a Claim for an unsecured deficiency after surrender and liquidation or other disposition of the collateral securing said Claim, and only such entity, shall be entitled to file, not later than thirty (30) days after the Confirmation Date, a Proof of Claim for damages alleged to arise from the rejection or termination of the executory contract or unexpired lease, or for the unsecured deficiency that may arise from liquidation of collateral, to which such entity is a party.

## ARTICLE IV.    MEANS FOR EFFECTUATION OF THE PLAN

A.    Reduction of Secured Debt Obligations.

Pursuant to the treatment to be accorded on account of the Class 2 Claim, the Debtor and Reorganized Debtor's largest financial obligation (that of its senior secured debt holder), the monthly debt service obligations of the Debtor and Reorganized Debtor shall be significantly and dramatically reduced.  The fixing and reduction of the interest rate to be paid by the Debtor and Reorganized Debtor (and calculating principal and interest payments on a 30-year amortization) are the keystones to this change.  Those changes alone will allow the Debtor and Reorganized Debtor to "cash flow" their business operations, based on the projections of future income and expenses prepared by the Debtor's staff.

B.    Change in Property Management.

In addition to the modification of its existing financing arrangement with BOTW hereunder, the Reorganized Debtor shall make the necessary changes to its business operations to result in greater efficiencies and increased profits.  The Debtor and Reorganized Debtor shall retain its corporate form and continue to operate its apartment properties as residential units for lease.  After thorough analysis, the Debtor has determined that the causes of the Debtor's pre-petition financial distress, which resulted in BOTW initiating foreclosure proceedings and

16

culminating in this Bankruptcy Case, were the direct result of the gross mismanagement of the Debtor's real estate operations by Dial Properties, it's prior outside third-party property manager. The Reorganized Debtor shall forego outside third-party property management entirely and conduct all property management of its residential apartment properties in-house in order to be more cost-effective and efficient.

Among some of the changes that have been or shall be implemented or otherwise reinstated are:

1.    Changes to its procedures for background and credit checks of prospective tenants;

2.    Changing rental standards to reduce the risk of renting to undesirable tenants that cause damage, fail to pay their rent on time, and not skip out owing money after vacating their tenancy;

3.    Diligent record keeping and accounting procedures to increase income and reduce expenses, including implementation of new software;

4.    More maintenance and repairs handled in-house, as opposed to hiring contractors;

5.    Better control and use of security and pet damage deposits, resulting in more of the security deposit used after tenants leave, rather than paying for same out of general funds;

6.    New, better, and more diligent collections of amounts owed by tenants who terminate their leases early without paying the full amount they contracted to pay; and

7.    Aggressive collection of current bad debt that prior management failed to pursue.

C.    Compliance with Projections.

The Reorganized Debtor shall operate its business in material compliance with: (i) the

cash expenditures set forth in the projections attached to this <u>Disclosure Statement and/or</u> Plan

and/or (ii) updates to such projections, which updates shall be implemented as described below.

The Reorganized Debtor shall be deemed to be in material compliance with the projections or the

updates thereto so long as it neither makes nor suffers a change in its business as presented in the

projections (or in the updates thereto) so as to materially increase the risk of non-payment to

unsecured creditors hereunder.

**ARTICLE V. <u>DESCRIPTION OF THE DEBTOR</u>**

A.    <u>Description of the Debtor's Business</u>

Eagles Crest Leasing Group 1, LLC is a single asset, single purpose Iowa Limited

Liability Company formed to develop, construct, own, and operate a 167-unit residential

apartment complex in Davenport, Iowa.  It has continued to own and operate the residential

apartment complex since completion of construction.  ECLG was formed September 24, 2002,

by John Pratt, Alan Meyer, and Daniel Ahrens as a leasing company for ECLG's thirteen (13)

residential apartment buildings.

B.    <u>Principals of Debtor</u>

As of the Petition Date, ownership of the corporate Debtor was as follows: John Pratt

holds 49.99%, Alan Meyer holds 49.99%, and Dan Ahrens holds .02% of the outstanding and

issued interests in the Debtor.  John Pratt will continue to play an active role as Manager of the

Reorganized Debtor's day-to-day operations, and Alan Meyer and Dan Ahrens will continue to

play a minority role in the decisions of the corporate Reorganized Debtor, and not be active

managers of the day-to-day operations. No member will receive any compensation for being

members or managers of the corporate entity.

18

**ARTICLE VI.        REASONS FOR FINANCIAL DIFFICULTIES**

The Debtor asserts that its pre-petition financial difficulties were the direct result of the gross mismanagement of its properties by its prior outside, third-party management company, Dial Properties, Co.  Prior to the retention of Dial Properties, the Debtor's apartment rental business operations were managed in-house.  Based on the Debtor's investigation, Dial Properties' inability to control unnecessary expenses, coupled with an inability to maintain sufficiently high occupancy levels, led to Bank of the West's foreclosure action, and ultimately the instant Chapter 11 bankruptcy case.

**ARTICLE VII.        PRE-PETITION ASSETS AND VALUATION**

A listing of the Debtor's pre-petition assets are attached hereto as Exhibit "C" to this Disclosure Statement.  The values shown are either at fair market value or book value.

**ARTICLE VIII.        HISTORICAL AND CURRENT FINANCIAL INFORMATION**

To provide creditors with information regarding the status of the Debtor's current financial position, the Debtor has attached the summary page of each of its post-petition Monthly Operating Reports.  For more detailed information, you are directed to review the complete Monthly Operating Reports themselves.  If you do not have access to view those Monthly Operating Reports on the Court's Docket, copies will be provided upon request made to Debtor's General Reorganization Counsel.

**ARTICLE IX.        LIQUIDATION ANALYSIS**

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis.  Under the Best Interest Test, if a Claimant or Interest holder is in an impaired Class (and that Claimant or Interest holder does not vote to accept the Plan), then, under the Plan, that Claimant or Interest holder must receive or retain property of a value not less than the amount

that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the

Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee.  Secured

Creditors are paid first from the sales proceeds of properties on which the Secured Creditor has a

lien.  Administrative Claims are paid next.  Next, Unsecured Creditors are paid from any

remaining sales proceeds, according to their rights to priority.  Unsecured Creditors with the

same priority share in proportion to the amount of their allowed unsecured Claims.  Finally,

Interest holders receive the balance that remains after all Creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must find that all Creditors and

Interest holders who do not accept the Plan will receive at least as much under the Plan as such

holders would receive under Chapter 7 liquidation.  The Plan Proponent maintains that this

requirement is met here because under a Chapter 7 liquidation scenario, substantially all, if not

all, assets of the Debtor would be used to satisfy the claim of the Debtor's senior secured

creditor, and there would be little to no assets available to satisfy any claims of unsecured

creditors.  The Plan proposes to pay creditors a 100% dividend on account of all Allowed

General Unsecured Claims.

Attached is Exhibit B, in balance sheet format, showing that all Creditors and Interest

holders will receive at least as much under the Plan as such Creditor or Interest holder would

receive under a Chapter 7 liquidation.  The data contained in the financial analyses are estimates

only, based upon the best information currently available.  The Debtor reserves the right to revise

the data as more accurate information becomes available.

## ARTICLE X. <u>FEASIBILITY</u>

Another requirement for confirmation involves the feasibility of the Plan, which means

that confirmation of the Plan is not likely to be followed by the liquidation, or the need for

further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough Cash on hand on the Effective Date of the Plan to pay all the Claims and expenses which are entitled to be paid on such date. The second aspect of feasibility considers whether the Proponent will have enough Cash over the life of the Plan to make the required Plan payments.

The Proponent has provided financial statements which include projected financial information. Please refer to Exhibit D for monthly Summaries of Financial Status. YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL STATEMENTS.

**ARTICLE XI.**        **FINANCIAL PROJECTIONS**

Attached to this Disclosure Statement as Exhibit E is a spreadsheet entitled Projections, which depicts projected income and expenses from operations following the Effective Date. The Projections were prepared by Diana Pratt and Donna Utsler, the Senior Property Manager and In-House Accountant, respectively. The Projections include assumptions and underlying facts indicating the grounds and basis for such projections. The Debtor considers the Projections to be conservative of its potential performance with the understanding that the Debtor's future performance will be measurably improved as the occupancy rate increases and additional cost savings are realized.

**ARTICLE XII.        ECLG AS CHAPTER 11 DEBTOR AND POST-PETITION EVENTS**

A.    <u>ECLG's Petition</u>

When it became clear ECLG's financial problems would require it to file bankruptcy, the

Debtor and its counsel determined that ECLG qualified as a Debtor under Chapter 11, and

therefore was entitled to file a petition under Chapter 11 of the Bankruptcy Code.  ECLG filed its

Voluntary Chapter 11 Petition for Relief on December 27, 2010 (Docket Item 1).  Pursuant to

Bankruptcy Code § 101(51D), the Debtor is not a small business debtor; however, pursuant to

Bankruptcy Code § 101 (51B), this case falls within the definition of being designated a single

asset real estate case.  ECLG is and remains a Debtor in Possession and no motions to appoint a

Chapter 11 Trustee have been filed.

B.    <u>Administrative and First-Day Orders</u>

On December 27, 2010, the Debtor filed a Motion to Change Venue (Division to

Division) (Docket Item 3) and the Court entered an Order on January 26, 2011, granting said

Motion (Docket Item 30).

On December 27, 2010, the Debtor filed an Application to Employ General

Reorganization Counsel (Docket Item 4).  On January 24, 2011, the Bankruptcy Court entered an

Order approving the employment of Bradshaw, Fowler, Proctor & Fairgrave, P.C. ("Bradshaw

Law Firm" or/and "Firm") as the Debtor's Chapter 11 General Reorganization Counsel (Docket

Item 24) and Donald F. Neiman, Esq., and Jeffrey D. Goetz, Esq. are the attorneys primarily

responsible for representing the Debtor in this case.

Pursuant to a notice filed on January 3, 2011, and mailed to all Creditors, the Court

scheduled a Section 341(a) First Meeting of Creditors (Docket Item 10) for January 20, 2011, at

2:30 p.m. and setting a deadline for filing non-governmental Proofs of Claim for April 20, 2011.

John R. Pratt appeared in his authorized capacity as the representative of the Debtor at the 341a

meeting and was duly examined by James L. Snyder, Esq., the trial attorney in the Office of the

United States Trustee for Region 12.  The 341a meeting was concluded that day.

       C.     Official Unsecured Creditors Committee

On March 23, 2011, the Office of the United States Trustee filed its Notice of Failure to

Appoint Creditor Committee (Docket Item 55). As of the filing of this Disclosure Statement, no

official committee of Unsecured Creditors has been appointed by the Office of the United States

Trustee in this Case.

       D.     Cash Collateral Stipulation

The Debtor filed a Motion to Use Cash Collateral on December 27, 2010 (Docket Item

5), and Secured Creditor, Bank of the West, filed an Objection on January 4, 2011 (Docket Item

12). The Court then scheduled a hearing for February 1, 2011, at 11:00 a.m.  The hearing was

canceled by Minute Order entered by the Court on December 31, 2010 (Docket Item 32).  The

Debtor filed a proposed Consent Order on February 3, 2011 (Docket Item 33), and the Court

entered the Order Granting the Motion to Use Cash Collateral and Providing Post Petition Liens

(Docket Item 36) on February 8, 2011.  The terms and conditions of the Stipulated Consent

Orders are incorporated by reference into the terms and provisions of the Plan.

       E.     Claims Bar Dates

         1.     Claims for Pre-Petition Debts

Pursuant to the Notice of Chapter 11 Case, Meeting of Creditors and Deadlines filed by

the Bankruptcy Court on January 3, 2011 (Docket Item 10), and served on all Creditors (Docket

Item 15), the deadline to file a Proof of Claim for non-governmental pre-petition Claims was set

for April 20, 2011.  That deadline, or "Bar Date," applies to all pre-petition Claims other than

governmental unit Claims and Administrative Expense Claims, and Claims arising from the

rejection of executory contracts or unexpired leases.  Pursuant to Bankruptcy Code § 502(b)(9),

any Person or entity that is required to file a Proof of Claim, but fails to do so by April 20, 2011,

will not be treated as a Creditor for purposes of voting or distribution, and any Claim of such

Person or entity is statutorily barred.

2.      Administrative Expense Claims

At the hearing on Confirmation, the Debtor will request the Court set the first Business

Day that is at least thirty (30) days after the Effective Date of the Plan as the Bar Date for filing

Motions for Allowance of Administrative Expense Claims.  Any party failing to timely file and

serve such an application for payment by the applicable deadline will be forever barred from

asserting a Claim against the debtor, or from sharing in any distribution under the Plan.  All

objections, if any (to the allowance and approval of such Claims), must be filed and served not

later than sixty (60) days after the Effective Date.

F.      General Reorganization Counsel - Bradshaw, Fowler, Proctor & Fairgrave, P.C.

ECLG engaged the Bradshaw Law Firm as its General Reorganization Counsel.  Donald

F. Neiman, Esq., and Jeffrey D. Goetz, Esq. are the two shareholders of the Bradshaw Law Firm

primarily responsible for representing the Debtor in this case.  On July 8, 2010, the Debtor

provided a $15,000.00 retainer to the Firm which was deposited in the Firm's trust account.

Between July 8, 2010, and the filing of the Petition, the Debtor incurred $13,670.28 in pre-

petition attorney fees and $1,039.00 for the filing of the bankruptcy, for a total of $14,709.28.

Since the Petition Date, the Firm has filed two interim fee applications.  On March 29,

2011 the Firm filed its First Interim Application for Allowance and Payment of Attorney's Fees

and Costs for Debtor's General Reorganization Counsel (Docket Item 57) for the time period of

December 27, 2010 through February 28, 2011.  On May 6, 2011, the Court approved said

Application (Docket Item 66) for a total of $14,946.50 in fees and $1,119.34 in expenses.  In

accordance with the Court's Order, the Firm transferred the $15,000.00 retainer for partial payment

of the fees and expenses.

On May 19, 2011, the Firm filed its Second Interim Application for Allowance and

Payment of Attorney's Fees and Costs for Debtor's General Reorganization Counsel (Docket Item

69) for the time period of March 1, 2011, through April 30, 2011.  On June 16, 2011, the Court

entered a Consent Order between the Firm and the Office of the United States Trustee (Docket Item

79) which approved $3,320.67 in fees and $35.90 in expenses.  In accordance with the Court's

Order, the Debtor has paid the Firm $3,356.57.

ECLG expects to incur an additional approximately $20,000.00 in attorney's fees and costs

for its General Reorganization Counsel through the Effective Date.  If there is a contested hearing

regarding confirmation of the Plan, the fees and costs of the Debtor's counsel could be substantially

higher.

**ARTICLE XIII.**          **MANAGEMENT AND THEIR COMPENSATION**

After the Effective Date, the Managers, Officers, and Interest Holders of the Reorganized

Debtor will remain the same as before the Effective Date, which is the same as on the Petition

Date.  In particular, John R. Pratt, Alan E. Meyer, and Dan Ahrens will continue to be the sole

Members and John Pratt and Alan Meyer will continue to be the sole Managers.  Mr. Pratt and

Mr. Meyer have not taken any salaries during the pendency of the Bankruptcy Case and will not

receive any compensation after the Effective Date for being Managers of the Reorganized

Debtor.  The following are the current employees of the Debtor, who will continue to be

employed after the Effective Date, and their positions and their gross monthly compensation:

| | | |
|---|---|---|
| Diana Pratt | General Manager | $6,750.00 |
| Greg Paper | Leasing Agent | $2,000.00 |
| Donna Utsler | Accounting | $1,978.00 |
| Heather Arey | Secretary | $1,040.00 |
| Ramon Cantu | Maintenance Supervisor | $1,387.00 |
| Brett Arey | Maintenance | $1,156.00 |
| Angel Cantu | Maintenance | $693.00 |
| Meghan O'Brien | Cleaning | $1,156.00 |
| Alex Hahn | Cleaning | Rent free tenancy in lieu of payroll |

**ARTICLE XIV.     UNITED STATES TRUSTEE SYSTEM FUND FEES**

A fee is required by the provisions of Title 28 United States Code § 1930(a)(6), to be paid quarterly to the United States Trustee by a Debtor in a Chapter 11 case.  The amount of the fee is based on the Debtor's disbursements for the preceding quarter.  The Debtor's obligation to pay the fee continues after Plan confirmation and until the Chapter 11 case is fully administered and closed.

On the Effective Date of the Plan, the Debtor shall be current with all quarterly fees due as of that date.  Any delinquent fees will be paid in full on the Effective Date of the Plan.  Quarterly fees will be paid every calendar quarter thereafter as a first priority under the Plan until the case is closed.

**ARTICLE XV.     TAX ANALYSIS**

The Debtor will not seek a ruling from the Internal Revenue Service prior to the Effective Date with respect to any of the tax aspects of the Plan.  **EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS/HER/ITS TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX**

**CONSEQUENCES OF THE PLAN.** The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtor. The Plan Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the tax code embodies many complicated rules which make it difficult to completely and accurately state all of the tax implications of any action or transaction.

      A.    <u>Tax Impact on the Debtor</u>

The Debtor is a limited liability company, which means it is a "pass-through" entity and does not incur any income tax liability. The Debtor's equity interest holders receive K-1 statements from the Debtor and report any gains and losses on their individual income tax returns. The Debtor therefore does not, and will not, incur any capital gains tax liability nor benefit from any net operating loss carryover, as a result of the treatment of claims under the Plan. Therefore, there will be no adverse income tax consequences as a result of confirmation of the Debtor's Chapter 11 Plan.

      B.    <u>Tax Impact on Creditors</u>

ANY PERSON CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN IS STRONGLY URGED TO CONSULT WITH HIS/HER/ITS OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS TO DETERMINE HOW THE PLAN MAY AFFECT HIS/HER/ITS FEDERAL, STATE, LOCAL, AND FOREIGN TAX LIABILITY.

The Debtor is unaware of any adverse tax consequences of the Plan to Creditors. It is not necessary or practical to present a detailed explanation of the federal income tax aspects of the Plan or the related bankruptcy tax matters involved in this Chapter 11 case. The tax consequences resulting from the Plan to each individual Creditor should not vary significantly

from the past tax consequences realized by each individual Creditor.  To the extent that the tax

consequences do vary for individual Creditors, each one is urged to seek advice from his/her/its

own counsel or tax advisor with respect to the federal income tax consequences resulting from

confirmation of the Plan.

The Debtor and Reorganized Debtor, as disbursing agent, will withhold all amounts

required by law to be withheld from payments to holders of Allowed Claims.  In addition, such

holders may be required to provide certain tax information to the disbursing agent as a condition

of receiving distributions under the Plan.  ECLG will comply with all applicable reporting

requirements of the Internal Revenue Code of 1986, as amended.

Creditors may realize taxable income if they receive payments from the Debtor's Plan

and they are on the tax basis of accounting for tax return purposes.  Furthermore, Creditors may

incur taxable income if they receive payments from this Plan and they have written off the

accounts receivable balance.

C.      Tax Impact on Equity Interest Holders

The Debtor does not foresee a tax impact on Equity Interest holders.

**ARTICLE XVI.      RISKS TO CREDITORS UNDER THE PLAN AND AVOIDANCE
ACTIONS**

Creditors will be paid under the Plan from revenues generated and profits made by the

Reorganized Debtor's continued and future business operations.  The proposed Plan has risks

which could impair the Debtor's ability to make a profit including acts of God such as flood,

drought, and tornadoes, and the condition of the economy.

The Debtor's ability to fulfill it obligations under the Plan is also faced with risk if the

Debtor and Reorganized Debtor are unable to implement and institute the management and

operational changes contemplated under the Plan.  There is also a risk of changes to the

apartment rental marketplace in and around Davenport, Iowa, that may negatively impact the Debtor and Reorganized Debtor's ability to increase rents to market rates and still maintain a sufficiently high enough occupancy rate.

In addition, the Debtor has conducted and will continue to conduct a reasonable and diligent investigation and determine whether or not avoidance actions exist pursuant to the Bankruptcy Code.  At this time the Debtor does not anticipate that any such avoidance actions exist or will be pursued.

## ARTICLE XVII.    DEFAULT PROVISIONS

A.    Events of Default

The following shall be "Events of Default" under this Plan:

1.    ~~The failure of the Reorganized Debtor to make any plan payment or payment of interest, principal, or property taxes required under the Plan when due, or the failure to maintain and provide evidence of insurance as required under the Loan Documents, and the receipt of written Notice of Monetary Default (defined below) from a Claim holder regarding such missed payment; provided, however, that, except as otherwise provided in this Plan, no Monetary Default shall be deemed to have occurred if such missed payment is made within thirty (30) days of service of a Claim holder's written of failure to make such a payment.  In the case of a Non-Monetary Default, the Debtor or Reorganized Debtor shall have two (2) years from receipt of written Notice of Non-Monetary Default to cure such a Non-Monetary Default.~~ The Default, Notice and Cure provisions regarding the Claim of the Class 2 Claimholder, Bank of the West are separate and distinct from the Default, Notice and Cure provisions that will apply to Creditors with Unclassified Claims and the Claims of Creditors with Claim in Classes 3, 4 and 5. The specifics of the separate Default, Notice and Cure provisions for the Class 2 Claim are detailed in Article III, Section (C)(2).

2.      Regarding the Claims of Creditors with Unclassified Claims and Creditors with Claims in Classes 3, 4 and 5, the failure of the Reorganized Debtor to make any plan payment or payment of interest, principal, or taxes required under the Plan when due, and the receipt of written Notice of Default (defined below) from a Claim holder regarding such missed payment; provided, however, that, except as otherwise provided in this Plan, no Default shall be deemed to have occurred if such missed payment is made within thirty (30) days of service of a Claim holder's written of failure to make such a payment.

2.      Provided no agreement exists to extend or modify the terms of any agreement between the Reorganized Debtor and its Creditors, failure of the Reorganized Debtor to pay when due all debts and expenses in the ordinary course of its financial affairs.

3.      Failure to comply with any provision of this Plan.

B.      Cure of Prior Defaults.

As of the date of the Confirmation Order becoming a Final Order, any and all defaults, either pre-petition or post-petition, by the Debtor under any bankruptcy or non-bankruptcy agreement or judgment shall be deemed cured, and notice of default or sale recorded by any Creditor prior to the Effective Date shall be deemed null, void, and to have no further force or effect.

C.      Consequences of Default.

Notwithstanding any contrary provision in the Plan, the Disclosure Statement, any pleading, order, or other document filed in this case, or any other document, contract, or agreement, should the Debtor or the Reorganized Debtor fail in any material respect to timely perform its duties and commitments under the Plan, including, but not limited to, making the payments to holders of Claims called for in the Plan, any party in interest adversely affected by

such failure may give the Debtor notice, in writing, of such failure to perform (a "Notice of
Default"). If a ~~Monetary~~ Default is not cured within thirty (30) days, ~~or a Non-Monetary Default
is not cured within two (2) years after service of the Notice of Default,~~ the adversely affected
party may file a motion with the Court to determine what relief may be appropriate because of
such default, including but not limited to the entry of an order to timely perform under the Plan,
dismissal of the case, or conversion of the case to one under Chapter 7; provided, however, that
if a final decree closing this Bankruptcy Case has been entered by the Court, the adversely
affected party may seek relief in state court. In the alternative, if allowed by the applicable
provisions of the Bankruptcy Code and state law, if such a ~~Monetary~~ Default is not cured within
thirty (30) days, an adversely affected taxing authority may declare the entire amount of its
Allowed Claim(s) immediately due and payable and thereafter proceed to enforce collection
using any and all of its state law remedies for the collection of unpaid taxes. In addition to and
not in lieu of the foregoing, after an Event of Default, an adversely affected party may seek
remedies in any appropriate court of competent jurisdiction to deal with such an Event of
Default.

　　　　Notwithstanding the foregoing, the Reorganized Debtor or another party in interest may
seek an order of the Bankruptcy Court staying any Creditor from pursuing its Default rights and
remedies based on appropriate grounds. Except as otherwise specified in this Plan, such grounds
may include, among others: (1) that no uncured Event of Default has occurred; and (2) that the
Creditor is adequately protected and the Reorganized Debtor is likely to be able to cure any
Event of Default within a reasonable period of time taking into account the Reorganized
Debtor's right to seek modification of this Plan in accordance with applicable bankruptcy law.
The Debtor shall bear the burden of proof with respect thereto.

Notwithstanding any term or provision in this section to the contrary, the foregoing methodology for creditors relating to potential Events of Default, shall not be binding upon the Class 2 Creditor, BOTW and the methodology for BOTW concerning any Event of Default of the Class 2 claim of BOTW is set forth in section 2 of Article III hereinbefore.

Notices pursuant to this Article shall be served as follows:

Counsel for the Reorganized Debtor:

Jeffrey D. Goetz, Esq.
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004

Reorganized Debtor:

Eagles Crest Leasing Group 1, LLC
Attention: John R. Pratt, Manager
P.O. Box 5247
Coralville, IA 52241

D.      Post-Confirmation Conversion/Dismissal

A Creditor or interested party may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan. If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

E.      Revocation of the Order Confirming the Plan

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if a party

32

in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry

of the order of confirmation.

## ARTICLE XVIII.    EFFECT OF CONFIRMATION OF PLAN

A.    Discharge

Upon confirmation of the Plan, the Debtor shall receive the broadest discharge possible

under Bankruptcy Code § 1141(d)(1), limited as applicable by the provisions of Bankruptcy

Code § 1141(d)(6).  More particularly, confirmation of the Plan shall discharge the Debtor from

any Claim or debt that arose before the Confirmation Date and any debt of a kind specified in

Bankruptcy Code § 502(g), 502(h) or 502(i), whether or not (i) a Proof of Claim based on such

debt is filed or deemed filed under Bankruptcy Code §501, (ii) such Claim is allowed under

Bankruptcy Code § 502, or (iii) the holder of such Claim has accepted the Plan.

Pursuant to Bankruptcy Code § 524, the discharge (i) voids any judgment at any time

obtained to the extent that such judgment is a determination of the ~~personal~~ liability of the

Debtor with respect to any debt discharged under Bankruptcy Code § 1141, whether or not

discharge of such debt is waived, and (ii) operates as an injunction against the commencement or

continuation of an action, employment of process, or an act to collect, recover, or offset any such

debt as a ~~personal~~ liability of the Debtor, whether or not discharge of such debt is waived.

Notwithstanding the foregoing, confirmation of the Plan will not discharge the

Reorganized Debtor from any debt (A) of a kind specified in paragraph (2)(A) or (2)(B) of §

523(a) of the Bankruptcy Code that is owed to a domestic governmental unit; or (B) for a tax or

customs duty with respect to which the Reorganized Debtor (i) made a fraudulent return, or (ii)

willfully attempted in any manner to evade or to defeat such tax or such customs duty.

B.      Binding Effect

The provisions of the Plan, the Confirmation Order, and any associated findings of fact or conclusions of law shall bind the Debtor, any entity acquiring property under the Plan, and any Creditor of the Debtor, whether or not the Claim of such Creditor is impaired under the Plan and whether or not such Creditor has accepted the Plan.

C.      Vesting of Property

Confirmation of the Plan vests all of the property of the Debtor's Chapter 11 estate, including Causes of Action, in the Reorganized Debtor, subject only to such liens, encumbrances, and security interests as are provided for in this Plan.  As of the Confirmation Date, the assets of the Debtor and of the Reorganized Debtor dealt with under the Plan shall be free and clear from any and all Claims or holders of Claims, except as specifically provided otherwise in the Plan or the Confirmation Order.  On the Confirmation Date, the Debtor and the Reorganized Debtor shall be entitled to control its financial affairs without further order of the Bankruptcy Court and to use, acquire, and distribute any of its property free of any restrictions of the Bankruptcy Code or the Bankruptcy Court, except as specifically provided otherwise in the Plan or Confirmation Order.  The terms of the Plan shall supersede the terms of all prior orders entered by the Bankruptcy Court in the Bankruptcy Case and the terms of all prior stipulations and other agreements entered into by the Debtor with other parties in Interest, except as specifically recognized in the Plan or the Confirmation Order.

D.      Modification of the Plan

The Proponent of the Plan may modify the Plan at any time before confirmation. However, the Court may require a new Disclosure Statement and/or revoting on the Plan.

34

The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed modifications after notice and a hearing.

E.    <u>Post-Confirmation Status Report</u>

Within 120 days of the entry of the Order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest Unsecured Creditors, and those parties who have requested special notice.  Further status reports shall be filed every 120 days and served on the same entities.

F.    <u>Final Decree</u>

Once the estate has been fully administered (as referred to in Federal Rule Bankruptcy Procedure 3022), the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.

G.    <u>Retained Bankruptcy Court Jurisdiction</u>

The Bankruptcy Court shall retain jurisdiction over the Bankruptcy Case subsequent to the Confirmation Date to the fullest extent permitted under § 1334 of Title 28 of the United States Code, including, without limitation, for the following purposes:

1.    To determine any requests for subordination pursuant to the Plan and Bankruptcy Code § 510, whether as part of an objection to Claim or otherwise;

2.    To determine any motion for the sale of the Debtor's or the Reorganized Debtor's property, or to compel reconveyance of a lien against or Interest in such property upon payment, in full, of a Claim secured under the Plan;

3.      To determine any and all proceedings related to allowance of Claims or

objections to the allowance of Claims, including objections to the classification of any Claim and

determination of any deficiency Claim following any event of default under this Plan, and

including, on an appropriate motion pursuant to Federal Rule of Bankruptcy Procedure 3008,

reconsidering Claims that have been allowed or disallowed prior to the Confirmation Date;

4.      To determine any and all applications of Professional Persons and any

other fees and expenses authorized to be paid or reimbursed in accordance with the Bankruptcy

Code or the Plan;

5.      To determine or to exercise any rights pursuant to Bankruptcy Code §§

506, 544-551, and 553;

6.      To modify the Plan or the Disclosure Statement, or to remedy any defect

or omission or reconcile any inconsistency in any order of  the Bankruptcy Court (including the

Confirmation Order), the Plan, or the Disclosure Statement in such manner as may be necessary

to carry out the purposes and effects of the Plan;

7.      To determine disputes regarding title of the property of the estate claimed

to be property of the estate or of the Debtor whether as Debtor or Debtor In Possession, but not

as to title to real property acquired after the Effective Date;

8.      To ensure that the distributions to holders of Claims are accomplished in

accordance with the provisions of the Plan;

9.      To hear any other matter not inconsistent with Chapter 11 of the

Bankruptcy Code;

10.     To enter a final decree closing the Bankruptcy Case;

11.     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, or vacated; and

12.     To determine such other matters as may arise in connection with the Plan, the Disclosure Statement, or the Confirmation Order.

H.     <u>Abstention</u>

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction, over any matter arising out of the Bankruptcy Case, this post-confirmation jurisdiction section above shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**ARTICLE XIX.     <u>CONCLUSION AND RECOMMENDATION</u>**

This Disclosure Statement has been presented for the purpose of enabling Creditors to make an informed judgment to accept or reject the Plan. *<u>Creditors are urged to read the Plan in full and consult with their counsel if questions arise.</u>* Notwithstanding any inconsistencies between this Disclosure Statement and the Plan, the terms and conditions of the Plan shall control the treatment of Creditors' Claims and the amounts of any distributions under the Plan.

The Debtor believes that the text of this Disclosure Statement, its Exhibits, and the Plan itself as incorporated herein demonstrate that the Debtor's Plan will provide the greatest amount of funds for the payment of the legitimate Claims of Creditors.

<u>The Debtor strongly urges all Creditors to vote to accept the Plan.</u> You are urged to complete the Ballot and return it immediately in accordance with the instructions above.

DATED:  ~~June 24~~August 12, 2011                    Respectfully Submitted

                                                      EAGLES CREST LEASING GROUP 1,
                                                      LLC

                                                      By:    */s/ John R. Pratt*
                                                             John R. Pratt, Manager

Prepared by:
Jeffrey D. Goetz, Esq., IS# 9999366
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com

General Reorganization Counsel for Eagles Crest Leasing Group 1, LLC
Debtor and Debtor in Possession and Plan Proponent

EXHIBIT A - Schedule Of Allowed Class 3 Administrative Convenience Claims And Allowed
Class 4 General Unsecured Claims

EXHIBIT B - Liquidation Analysis

EXHIBIT C - Pre-Petition Assets

EXHIBIT D - Summary Pages Of Post Petition Monthly Operating Reports From January Thru May, 2011

EXHIBIT E - Projections Of Future Income And Expenses June 2011 Through December 2013